MICHAEL J. CURLEY v. THE BOARD OF CHOSEN FREE-HOLDERS OF THE COUNTY OF HUDSON.

Argued February 26 and 27, 1901—Decided June 10, 1901.

1. Approval by the chief engineer of a public road authorized by the act of April 7th, 1888 (*Gen. Stat.*, p. 2882), or its supplements, is a prerequisite to recovery under a contract for the building and construction of such road, unless payment of the claim shall have been ordered by a two-thirds vote of all the members of the

board of chosen freeholders of the county within which such road is laid out.

2. Work and materials necessary for the maintenance or repair of such a road may be awarded by such board of chosen freeholders, without advertisement and contract with the lowest bidder, notwithstanding the cost may exceed $1,000. The requirement of the statute of advertisement and contract applies only to original construction.

3. A contract for a county public road fixed the price for excavation and filling at specified rates for excavation only, and required all fills to be made with materials excavated from the road, unless the contractor should prefer to borrow filling, in which case it should be without cost to the county. The required excavation of the road did not furnish enough material for the required fills. *Held,* that the contractor was entitled to recover for the deficiency provided from borrow-pits.

4. Interest on a demand required, by "An act in relation to the expenditure of public money by municipal corporations," approved April 4th, 1871 (*Gen. Stat., p.* 2237), to be verified before payment is legal, can only be allowed from the date at which such verified demand is presented for payment.

On rule to show cause.

Before DEPUE, CHIEF JUSTICE, and Justices DIXON, COLLINS and HENDRICKSON.

For the defendant, in favor of the rule, *John Griffin.*

For the plaintiff, contra, *Charles L. Corbin.*

The opinion of the court was delivered by

COLLINS, J. The plaintiff contracted to build and construct two divisions of the branch road connecting the Hudson boulevard with Weehawken, and the claims in suit grew out of his contracts. The road was established under "An act to authorize the board of chosen freeholders of any of the several counties of this state to lay out, open, construct, improve and maintain a public road therein," approved April 7th, 1888 (*Gen. Stat., p.* 2882), and its supplements.

Under each contract a percentage of the certificates of sums earned as the work progressed was to be retained until a fixed time after the completion of the contract, and one of the

plaintiff's claims is for such retained and overdue percentages. His right to recover them is conceded.

Two claims for extra work ordered by the defendant and approved by the chief engineer appointed under the act, are also conceded.

Another claim approved by the chief engineer was disputed at the trial, but we agree with the county counsel that the jury's resolution of the dispute on the facts in favor of the plaintiff was justified, and that the claim is a fair one. Resistance to recovery is now made only on the ground that the claim exceeds $1,000, and is for work not let to the lowest bidder after advertisement. Section 11 of the act under which the road was constructed provides "that all work and materials over and exceeding one thousand dollars done or furnished in and about the opening, laying out, constructing and improving such road shall be made or furnished by contract, after advertisement in the following manner: * * * [two weeks in two newspapers] and [the board] shall thereafter, at some regular stated meeting, award the contract or contracts to the lowest responsible bidder, who shall furnish such good and sufficient sureties as may be approved by said board." The work in question was not construction, but repair. Under one of his contracts the plaintiff had built a retaining wall along low-lying property belonging to the Opdyke estate. Long after his contract was completed, and after the whole contract price was due him, this wall, through no fault of construction, was undermined by a flood and had to be partially rebuilt. It could not be told in advance how much would have to be rebuilt, but it was supposed that the cost would not exceed $1,000. The board and contractor disputed as to who should bear the cost, but the work was ordered done, and, as before stated, that dispute was settled by the jury in favor of the contractor. By section 15 of the act it is made the duty of the board "to maintain and properly light" the road, "and to keep the same in repair and fit for public use from year to year at the expense of the public at large of such county." No restriction in the performance of this duty is imposed, and therefore no contract or advertisement was neces-

sary.   There is a provision in the special act of March 23d, 1875 (*Pamph. L., p.* 324), under which Hudson county is organized, requiring contracts exceeding $1,000 to be awarded to the lowest responsible bidder, after advertisement for two weeks in two newspapers, but that applies only to "materials to be furnished or labor to be performed in, on, upon or about any of the institutions or places under the supervision of said board"—language not appropriate to this road.   The act authorizing the road is *sui generis,* and work under its authority is to be regulated only by its own provisions.   It is a general law, and must have uniform operation wherever put in force. Legislative opinion on this subject is afforded by a supplement to the act, approved March 24th, 1898.   *Pamph. L., p.* 173.   By that supplement is was enacted that, after a certain time, all duties touching the maintenance, lighting, repair and control of any road or branch road constructed under the act should devolve on a board of commissioners to be elected by the people, and it is enacted as follows:

"7. That should said commissioners determine to maintain, repair or light such road or any part thereof by contract, proposals for any such road shall be published for two weeks in at least two of the newspapers in such county, to be selected by said commissioners, and such contract shall be awarded to the lowest responsible bidder, who shall furnish satisfactory security for the performance of the same, to be approved by said commissioners."

This assumes that maintenance and repair of the road may be by contract or not, at the option of the freeholders and their successors, the commissioners.   It is reasonable that this should be so.   Repair may be by day's work or with convict labor.   It is very unusual to repair roads by contract. The sum justly due the plaintiff on this account is undisputed.

The only other claim to be considered, and the only one the amount of which is disputed, is for the price, at contract rates, of excavation in borrow-pits, rendered necessary for the filling required on division No. 2 of said branch road under the plaintiff's contract.   The main question is whether

the plaintiff is entitled to be paid for such necessary outside excavation, or whether, by his contract, he was obliged to do it gratutiously.  The question would not have arisen but for the fact, as is quite evident from a perusal of the contract, that the draughtsman assumed that the material excavated within the lines of the road in bringing the high places down to the established grade would be sufficient ·for all filling of low places necessary to bring them up to such grade.  This turned out not to be the case, hence the dispute.  The county, by due advertisement, invited proposals for the construction of the road, and accompanied the advertisement with the chief engineer's estimate of the work and materials required.  This estimate included excavation, but not filling.  The advertisement contained a notice that prices bid for excavation must include depositing as much of the same as might be required in "fills" along the line of the road.  Bidders were not to submit proposals for the whole work in a lump sum, but for a large number of different classes of work separately, and not for each class in a lump sum, but at a rate to be stated— for excavation by the cubic yard.  The contract awarded on the plaintiff's proposal provided that he should furnish all the materials and do all the work required for grading, regulating and improving the division according to the specifications on file in the office of the chief engineer, and the plans therein referred to for certain prices named, including "for each and every cubic yard of earth excavated, the sum of forty-nine cents," and "for each and every cubic yard of rock excavation, the sum of twenty-five cents;" and it was provided that the road should be brought to the established grade by excavating or filling the same, as might be necessary, the full width of the road, and that when the grades of intersecting streets were changed or affected by the grades of the new road, said streets should be graded and regulated as directed by the chief engineer in each case.  It was further provided as follows: "All fills shall be made with material excavated from the road without further cost than the prices bid for excavation, or if the contractor prefer to borrow filling in any case, it shall be done without cost to the county."  There are

various provisions throughout the contract that show that it was contemplated that the quantities and character of excavation would vary from the estimates.

Now, while, as I say, it was assumed that sufficient material for all filling required would be procurable within the lines of the road, it by no means follows that the true construction of the contract is that the contractor was obliged to supply a possible deficiency at his own cost. All that the contract means is that the price to be paid for excavation should include the deposit of the material at the "fills." A common method of payment for road construction is at a rate for excavation, whether within the lines of the road or in borrow-pits, such rate to include the necessary embankments and other filling. Resort to borrow-pits is more frequent in railroad than in highway construction, but the methods adopted are the same in both cases. The road in question had considerable embankment, enclosed within heavy retaining walls. The provision in plaintiff's contract that if he should *prefer* to borrow filling he should do it without cost to the county, simply means that he must not dispose of materials excavated within the lines of the road elsewhere than on the road, except by substituting for it other material at his own cost. He might desire to sell as paving blocks—as, in fact, the plaintiff did to a small extent—some of the rock removed, and if he should do so he must replace it with proper material from without. It is not supposable that the parties contemplated that the contractor should furnish necessary filling at his own expense if the material available within the line of the road was insufficient. For all necessary excavation, wherever made, the plaintiff should be paid at the contract rate. No practical difficulty in thus construing the contract arises from the fact that the rates of earth and rock excavation differ, for it is not to be thought that the parties could have expected that the contractor would blast rock from ledges elsewhere to put on the road's embankment. Embankments, except for retaining walls, of which I will speak later, are normally made of earth, not rock. Had the difference in rate been the reverse of what it was, there might

have been room for dispute. There is none in this case. The main question, therefore, must be solved as it was at the trial, in favor of the plaintiff.

The secondary question is as to the quantity of extra filling for which the plaintiff should be allowed at the excavation rate. Much of the rock excavated from the road was used in constructing retaining walls of embankments and for parapet walls. The plaintiff included in his claim an equivalent quantity, but this claim was rightly disputed. All these walls were bid and contracted for separately, by the cubic yard, at prices which must have included the material. If the contractor used in their construction rock that he excavated from the road, he was bound, under the contract, to supply its equivalent, if needed in the "fills," just as he was bound to replace any rock he sold for paving blocks. The jury were rightly instructed that the plaintiff could be allowed for the excavation outside the road of only such material as he had to get beyond what he could have used procured within the lines of the road. On that point there was dispute in the testimony. The chief engineer testified that the deficiency was three thousand eight hundred and forty-eight cubic yards, which, at the rate of forty-nine cents per yard, would come to $1,885.52. An assistant engineer, who had been in charge of the work, was employed by the plaintiff to make an independent calculation, and he testified that the deficiency was eleven thousand seven hundred and twenty-two cubic yards, and the jury adopted his figures.

We should have to consider the evidence supporting these differing estimates and decide whether or not the verdict could be supported, but for the fact of a legal question, not raised at the trial, but now presented, which is clearly controlling. By the eighteenth section of the act under which the road was built it is enacted "that a chief engineer, who shall have the supervision of the laying out and building of said road in accordance with the provisions of this act, shall be appointed by the judges of the inferior court of Common Pleas of such county, or a majority of them; said appointment shall be certified, in writing, under the hands of said judges, to said

board of chosen freeholders; * * * no moneys shall be paid to any contractor or person or persons engaged in the building and construction of said road * * * until the bill or claim therefor shall have been approved of by said chief engineer, except that said board may order the payment of any bill or claim without such approval by a two-thirds vote of all the members of such board." There has been no vote of the board of chosen freeholders upon the plaintiff's claim, and therefore, by the plain words of the statute, the claim cannot be paid without the approval of the chief engineer. It follows, logically, that, in the absence of fraud, no recovery can be had upon such claim without such approval. *Chism* v. *Schipper,* 22 *Vroom* 1. No method of approval is prescribed, and the chief engineer's testimony may fairly be taken as an approval of the amount of the claim, though not of its legality. As the defence of non-approval was not pleaded, we are disposed to permit recovery if the plaintiff is willing to accept the figures of the chief engineer; otherwise it is our duty, in view of the wide discrepancy of the estimates, to permit the pleadings to be amended, in order to be sure of doing justice to the county. The plaintiff, at his option, may strike out this claim from his declaration and bill of particulars, and pursue such course with regard thereto as he may be advised to take. The chief engineer is now *functus officio,* but, by the same section, the court may appoint a successor, who will be in a position to consider the plaintiff's claim.

There remains to be considered the matter of interest. By "An act in relation to the expenditure of public money by municipal corporations," approved April 4th, 1871 (*Gen. Stat., p.* 2237), it is, among other things, enacted that it shall not be lawful for any board of chosen freeholders to pay or disburse any money of the county unless the claimant shall first present a verified demand. In each of the claims above mentioned the plaintiff complied with the law in this respect, but in all except those in which percentages were retained under the contracts he did so a considerable time after his demand accrued. Attention was not called, at the

trial, to this fact, and interest was allowed from the time the demands respectively accrued. It is clear that a municipality ought not to be charged interest on a debt which, by reason of the creditor's neglect, it cannot legally pay. The verdict, therefore, must be reduced accordingly. In the case of the retained percentages, by inadvertence, interest was reckoned for too long a time. The percentage in each case was not due until six months after the completing of the contract, and interest should only run from that date.

The verdict should have been on the following basis:

| | | |
|---|---:|---:|
| Retained percentage on contract for division No. 1, | $5,663 | 06 |
| Interest from August 3d, 1898................ | 864 | 56 |
| Retained percentage on contract for division No. 2, | 4,995 | 83 |
| Interest from November 5th, 1898............ | 686 | 04 |
| Extra work conceded ($956.04 and $906.35).... | 1,862 | 39 |
| Interest from February 2d, 1899.............. | 228 | 76 |
| Rebuilding of Opdyke retaining wall .......... | 2,058 | 99 |
| Interest from August 2d, 1900................ | 67 | 59 |
| | $16,427 | 22 |
| If the claim for outside excavation is not struck out of the case, then it may be included, on the chief engineer's figures............... | 1,885 | 52 |
| Interest from August 2d, 1900................ | 61 | 91 |
| | $18,374 | 65 |

If the plaintiff will consent to the necessary remission, judgment may be entered on the verdict for $18,374.65, or, if he takes an order striking out from the suit the claim for outside excavation, judgment may be entered for $16,427.22. Otherwise the rule to show cause will be made absolute.